BULLOCK'S DEPARTMENT STORE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent WILLIAM G. and DORIS BULLOCK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bullock's Dep't Store v. Comm'r
Docket Nos. 7463-71, 7464-71. United States Tax Court
T.C. Memo 1973-249; 1973 Tax Ct. Memo LEXIS 38; 32 T.C.M. (CCH) 1168; T.C.M. (RIA) 73249; November 15, 1973, Filed *38 I. Held, on the facts, corporation's advances to its president and 99.9-percent shareholder were not loans, even though notes were executed, but were taxable dividends. II. Corporation's authorized bonuses for fiscal 1967 and 1968 to its president were neither paid nor credited on any corporate account within the 2-1/2 month period specified in sec. 267(a) (2) (A), I.R.C. 1954; consequently, held, claimed deductions for such bonuses were properly disallowed. III. Corporation's president indicated that a similar bonus in fiscal 1969 was to be credited on his note to the corporation. Such crediting would have required no further corporate action, but because of our holding on I, supra, this action must be characterized as a contribution to capital rather than a cancellation of indebtedness. Held, it follows that the fiscal 1969 bonus, which was reasonable in amount, was constructively received within the specified period and was properly deducted by the corporation. 2 IV. Held, corporation's president has failed to prove requisite profit motive as to purchase and lease of an airplane and consequently is not entitled to expense deductions or to an investment credit. John N. Stull *39 and John L. Kane, Jr., for the petitioners. Thomas M. Ingoldsby, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: In these consolidated cases, respondent has determined the following deficiencies in and addition to petitioners' Federal income taxes: Sec.
6651(a)
[1]
Petitioner
TYE
Deficiency
Addition
Bullock's Department
1/31/67
$ 660.00
Store, Inc.
1/31/68
443.00
[2] $ 22.00
1/31/69
4,685.00
William G. and Doris Bullock
12/31/66
119.00
12/31/67
3,298.00
12/31/68
8,974.00 Petitioners William G. and Doris Bullock have claimed an overpayment of at least $1,285 for their 1968 calendar year. The issues for our decision are: 1) Whether respondent properly classified as taxable dividends certain advances from Bullock's Department Store to William G. Bullock in 1966, 1967, and 1968; 2) Whether respondent properly disallowed, under section 267, deductions claimed by Bullock's for bonuses authorized for William G. Bullock in the amount of $3,000 for fiscal 1967, $2,000 for fiscal 1968, and $10,000 for *40 fiscal 1969; 3) If we find that respondent erred in denying Bullock's under section 267, a $10,000 deduction for William's 1969 fiscal year bonus, whether such amount is instead nondeductible as unreasonable compensation; 4) Whether in connection with an airplane he owned, William G. Bullock could, for 1968: a) deduct any amounts for expenses, under sections 162 or 212, and depreciation, under section 167, to the extent that such amounts exceeded the rental income from such plane; b) claim any investment credit under section 48; 5) The amounts of entitlement under 4(a) and (b), supra, if any. FINDINGS OF FACT Some of the facts have been stipulated and are so found. [3]
Petitioners William G. Bullock (William) and Doris Bullock (Doris) are husband and wife, who, at all times 4 relevant to the instant case, resided in Glenwood Springs, Colorado. William and Doris are calendar year, cash basis taxpayers, who filed joint Federal income tax returns for the 1966, 1967, and 1968 calendar years with the district director of internal revenue, Denver, Colorado. Petitioner Bullock's Department Store, Inc. (Bullock's the store, or the corporation), is a closely-held *41 Colorado corporation which had its principal place of business in Glenwood Springs, Colorado, at all relevant times. The store offers a wide variety of soft goods, including a full line of men's, women's and children's wear, western clothing, ski wear, and domestic items (towels, sheets and piece goods). Shoes and ski equipment are also sold. Bullock's is an accrual basis taxpayer, keeping its books and filing its Federal income tax returns on the basis of a fiscal year ending January 31. It filed Federal income tax returns for its 1967, 1968, and 1969 fiscal years with the district director of internal revenue, Denver, Colorado. At all relevant times, Bullock's board of directors included William, who was president and general manager and owned 99.9 percent of the corporate stock, Doris, who was secretary-treasurer and a full-time employee, and William's mother. William, who was in his later 40's during the taxable years involved in the instant case, has been in the retail sales business in Glenwood Springs since the mid-1940's. In late 1947, subsequent to his attendance at the University of Wyoming, William entered into partnership with his father, 5 and they operated a department *42 store in Glenwood Springs. On January 27, 1964, the business - Bullock's Department Store - was incorporated, and the following year William bought out his father's 50-percent interest in the corporation for $96,000. His father, who desired to retire from the department store business, accepted as payment William's personal note in the face amount of $96,000. Issues 1-2. Advances to William; Annual Bonus Deductions From time to time, Bullock's board of directors authorized the corporation to make advances to William. On March 3, 1964, the board authorized Bullock's to advance up to $35,000 to William during the period March 3, 1964 to January 31, 1965. The sum total of such advances, the resolution provided, was to be acknowledged by William's promissory note, to be executed and delivered to Bullock's on January 31, 1965. The note was to be a demand instrument, with interest of four percent per annum payable semiannually commencing in June of 1965. Advances totaling $8,840 were in fact made during the period covered by the resolution, and a note of the form described above in the face amount of $29,763.73 (such amount including advances during the period plus the outstanding *43 balance of William's advances as of March 3, 1964) was delivered to Bullock's by William on 6 March 1, 1965.A second and similar resolution was passed by the board in March of 1967, allowing additional advances to William of up to $50,000 through January 31, 1968. At the same time, the board required William to execute a note to Bullock's, dated January 31, 1967, in the face amount of $40,603.73, to reflect additional net withdrawals made by William between January 31, 1965, when the prior authorization lapsed, and March of 1967. Additional withdrawals were in fact made by William, both during and after the period specified in the second resolution, and notes in the form described above were occasionally executed to acknowledge the outstanding principal amounts of the advances. Each of such notes would in effect operate to "pay" the prior note, and, in addition, reflect the increase or decrease in amount of advances outstanding. [4] *44 7 The following schedule lists the advances and credits, and the approximate dates on which records of such were entered into the corporate books. It is to be noted that the outstanding balance of the advances was reflected in Bullock's 1967 and 1968 fiscal year returns as "loans to stockholders," while in 1969 return, such balance was carried as "other assets." Date of entry on corporate books
Advances
Credits
Balance pre-1/31/65
$20,923.73
--
$20,923.73
1/31/65
8,840.00
--
29,763.73
1/31/66
8,640.00
$ 6,000.00
32,403.73
1/31/67
8,200.00
--
40,603.73
1/31/68
3,692.71
--
44,296.44
8/31/68
5,000.00
--
49,296.44
1/31/69
8,450.00
--
57,746.44
7/1/69 to
12/31/69 [5]
n5
--
15,000.00
42,746.55
7/31/69
--
800.00
41,946.44
1/31/71
3,980.00 --
45,926.44
8/31/71
920.00
850.00
45,996.44
1/31/72
860.00
21,294.00
25,562.44
6/30/72
796.05
--
26,358.49
The advances recorded for 1965 and 1966 were made in order that William might pay principal and interest on the note he had executed to his father. His use of the *45 other advances listed is not established by the record. While all the notes executed carried interest of four percent, interest was not accrued on the books of the corporation, nor were any of William's credits allocated in any part to interest. As indicated on the above schedule there were no repayments entered on the books between January 31, 1966, and, at the earliest, several months after April 15, 1969. Such failure to make the semiannual interest payments on the notes rendered the notes due and collectible at once, both principal and interest. Bullock's, however, never demanded such full, or even partial payment. In the March 1967 resolution, Bullock's required William to pledge 200 shares of the stock of the Bank of Glenwood, and 200 shares of Glenwood Bank Building Corporation as security for the note for $40,603.73 which was to be executed as of January 31 of that year. Such shares were later required to secure the note for $44,296.44, executed on January 31, 1968. On March 31, 1969, William secured his then outstanding note for $42,000 by a pledge of 800 shares of the Bank of Glenwood, 800 shares of the Glenwood Bank Building Corporation and 82 shares of Rocky Mountain *46 Savings & Loan Association. The record does not establish the value of any of such shares of stock. The first $21,000 of repayments reflected in the schedule above came from annual bonuses awarded William by Bullock's. On December 7, 1964, Bullock's board resolved that, in addition to his annual salary William - shall be paid such annual bonus as shall be fixed and determined by the Board of Directors as soon as practical after January 31 of each year, which bonus shall be determined by taking into consideration the net earnings of the corporation before such bonus and the efficiency of operations throughout the said fiscal year. Pursuant to such resolution, the board voted William the following bonuses: Fiscal Year
Amount 1966
$6,000
1967
3,000
1968
2,000
1969
10,000
Once the bonuses were authorized, no further corporate resolutions were required in order that William be allowed to credit such bonuses against the outstanding amount in his advance account. Bullock's accountant, John P. McNulty (McNulty), [6] 10 would simply make entries on the books, at William's request, reflecting the intended use of the bonus to reduce the outstanding balance of the advances. If William had wished to receive *47 the bonuses in the form of cash, however, we do not know from the record before us whether he himself could write a check on the corporate account for this purpose, or whether a further corporate resolution would be required. The bonuses authorized for fiscal 1967 and 1968 - which were not included by William in his Federal income tax returns - were never paid in cash by Bullock's, nor were they entered as credits on the advances account until at least several months after April 15, 1969. There is also no evidence as to when such amounts were entered on Bullock's salary accounts. The minutes of a board meeting on March 31, 1969, two weeks before the IRS audit was to start, related that the fiscal 1969 bonus of $10,000 had already been credited on the books to William's advance account. However, notwithstanding such statement in the minutes, an actual credit was not entered on the books until several months after April 15 of that year. It has also not been established when such bonus was entered on Bullock's salary account. The fiscal 1969 bonus was, however, included in William's *48 1969 calendar year return.
Except for the $6,000 credit in 1966, all credits to the advance account were entered on the books subsequent to the IRS audit. The credits of $850 in August 1971, and $21,294 in January 1972, were entered subsequent to respondent's issuance of a statutory notice of deficiency to both William and Bullock's. On a financial statement dated June 30, 1968, which William used to apply for loans and discounting privileges from commercial banks, there was an entry in the liabilities' section for "Bills, (Notes) Payable" of $114,297 as "owing to relatives and friends," but there is no evidence in the record to support a finding that the outstanding balance of William's advance account with Bullock's was included in that figure. Under "stocks and bonds owned" William listed stock in the Bank of Glenwood. However, he gave no indication in the statement that any of such stock had been pledged as collateral to Bullock's for the advances. In the years here before us, Bullock's, which has never declared a dividend, had sufficient retained earnings to have made dividend distributions to William in the amount of the advances made during those years: 12 Fiscal Year
Retained Earnings 1967
$ 76,004
1968
84,556
1969
103,234
In *49 his 1966, 1967, and 1968 joint returns, William did not include in income any of the advances made to him by Bullock's during those years. In his statutory notice of deficiency, respondent increased William's taxable income in each such year by the amount by which the advances made during the year exceeded credits in such year, with adjustments to reflect that Bullock's is on a fiscal and William on a calendar year, and to allow for a larger dividend exclusion. If we sustain respondent's treatment of the advances as taxable dividends, there is no dispute that his adjustments are correct. In its 1967, 1968, and 1969 fiscal year returns, Bullock's claimed a deduction for the bonus authorized for William for each respective fiscal year. In his statutory notice, the Commissioner disallowed such deductions in full under section 267. Issue 3. Unreasonable Compensation William, who has been in the department store business in Glenwood Springs for over 20 years, had extensive duties at the store. Besides being the chief executive officer, William was in charge of the credit, personnel and advertising departments, and directed any fashion shows which the store conducted. 13 As head of *50 the personnel department, William personally trained each new sales person, and assisted extensively in selling activities on the floor. He was the head buyer for all but the lower level departments of the store and went on virtually all buying trips. The buyer for the lower level was Lloyd Bullock (Lloyd), William's cousin, who commenced work at such position sometime in 1966. It is clear, however, that Lloyd made no final decisions without William's thorough scrutiny, and that William, during the taxable years at issue, still looked upon Lloyd as being in a trainee status. In light of William's extensive experience, the location of the store in a small Colorado town, population 5,500, and the long and irregular workdays demanded, it would have been most difficult to have found a willing and comparable replacement for him. During 1968, William conducted feasibility studies for an expansion of the business. As a result of such studies Bullock's stores were opened in Aspen, Vail, and Steamboat Springs, Colorado. The Aspen store was the first to be opened. The store there was in the process of being built in 1968, and actual business activities did not commence, at the earliest, *51 until the latter part of 1968. The Vail and 14 Steamboat Springs stores were apparently not opened until after the taxable years before us. The Aspen store was established as a separate corporation - Bullock's of Aspen - with William owning 50 percent of the stock, McNulty, 16-2/3 percent, and the manager of the store another 16-2/3 percent. The store in Vail was a branch of the Aspen operation. As the driving force behind Bullock's, William was also, by far, its highest paid employee. [7] For fiscal 1967, Bullock's claimed a $47,000 deduction for compensation paid William; for 1968 the claimed deduction was $38,000. The reasonableness of neither of these two deductions has been challenged by respondent. At all times during the year, Bullock's had a minimum of 12 to 15 full-time employees. During those seasons when sales activities increased, the store might hire an additional 6 to 8 employees to do gift wrapping for customers. Each year at Christmas, if it had been a good year, the store would give bonuses *52 to the employees. The maximum amount of such bonus for an individual employee was $100, and the actual 15 amount given depended on the length of service of the particular individual. In addition, retired employees would be given monthly bonuses for the duration of their lives, as well as a discount on merchandise bought at the store. The only evidence in the record of a retirement plan under which William would receive benefits was a plan authorized by the board after the taxable years before us. The annual bonus plan for William has been discussed above. Bullock's gross receipts, gross profits (as reflected in the corporate return), and earnings before income taxes and salary increased each year during the taxable years involved in the instant case: Gross Receipts
Percent Increase
Fiscal Year
Amount
over prior year
1967
$ 555,651
No evidence
1968
581,974
4.7
1969
628,958
8.1
Percentage increase, 1967-9: 13.2
Gross Profits
Percent increase
Fiscal Year
Amount
over prior year
1967
$ 183,568
No evidence
1968
204,920
11.6
1969
250,320
22.2
Percentage increase, 1967-9: 36.4
Net Income Before Salaries and Income Taxes
Percent Increase
Fiscal Year
Amount
over prior year
1967
$ 114,945
No evidence
1968
124,189
8.0
1969
159,403
28.4
Percentage increase, 1967-9: 38.7
In *53 its 1969 fiscal year return, Bullock's deducted $50,200 as salary and bonus authorized for William. In his notice of deficiency, respondent disallowed $10,000 of the claimed deduction, which is the amount of the bonus authorized for William for that year. As mentioned above, respondent disallowed such amount on the basis of section 267. However, in the event we were to find that the $10,000 bonus deduction was not disallowable under section 267, respondent also disallowed such amount on the grounds that it was unreasonable compensation to William. Issue 4. Airplane Deductions and Credit As head buyer for Bullock's, William made trips to different cities to attend merchandise shows and purchase items for the store. In the 1968 fiscal year, for example, William made 18 such buying trips. Of these, 13 were to Denver, and one each to New York and Los Angeles. The trips to New York and Los Angeles were by means of commercial airplane, while those to Denver were normally made by car or bus. By 1968, it had become apparent to William that it would be advantageous for Bullock's to have an airplane at its immediate disposal. Flying via commercial airlines on buying trips had not proven *54 convenient. Glenwood Springs had an airport, but was not served by commercial planes. The nearest commercial airline terminus was in Aspen, 45 miles away from Glenwood Springs. The drive to Aspen, depending on the weather, took anywhere from 45 minutes to 3 hours, and the next nearest commercial airport, in Grand Junction, was a minimum 2-hour drive from Glenwood Springs. Other methods of transportation were similarly time consuming. Driving time to Denver, the city to which William made the majority of his buying trips and which was also the closest city to which such trips were made, was approximately 4 hours in good weather.In winter, when the roads were frequently blocked by heavy snows, and were hazardous, the trip could take much longer.Bus service to Denver, in good weather, normally took between five and six hours from Glenwood Springs. William was also convinced that the planned expansion to Aspen and Vail would be greatly facilitated if he had quick and easy access to an airplane. Once those stores opened, he foresaw the need for frequent trips between the stores, either to carry merchandise purchased on buying trips, or to effect merchandise transfers when a sale or *55 other circumstance made it incumbent that goods at one of the stores be transported to another. On August 10, 1968, William purchased a Bonanza Beechcraft E33 [8] airplane (the Bonanza or the plane) from Denver Beechcraft, Inc. William decided to purchase the plane in his own name, rather than that of Bullock's only because he did not wish Bullock's to be burdened by the liability arising from the purchase, and because he wanted to shield the corporation from the losses which would occur if the plane proved less useful than expected. The Bonanza had a useful load capacity of approximately 1,000 pounds, and with a single engine of about 225 horsepower, the plane would travel between *56 175 to 180 miles per hour. The useful life of the plane was estimated at eight years. William paid $28,850 for the Bonanza, $5,000 in cash and the balance by means of a bank loan arranged by Denver Beechcraft. On the Bonanza, flight time to Aspen from Glenwood Springs, in good weather, was between 12 and 15 minutes. Flight time to Denver, in good weather, was between 35 minutes and 1 hour. Vail was 23 miles from the nearest airport and there is nothing in the record as to flight time on the Bonanza from Glenwood Springs to such airport. On March 4, 1968, over five months before the actual purchase of the plane, William entered into a leasing agreement with Bullock's in connection with the Bonanza. The significant parts of the three-year agreement, between William, lessor, and Bullock's, the lessee, were as follows: 2. Lessor covenants and agrees that said airplane shall be made available to the Lessee at any and all reasonable times for use by Lessee in connection with trips necessary or convenient to Lessee in connection with its department store business conducted in Glenwood Springs, Colorado. 3. Lessee covenants and agrees to pay to the Lessor, as rental for said airplane, *57 the sum of $30.00 per hour for flying time, plus the cost of gasoline and oil, payment to be made to Lessor semi-annually upon a statement prepared and submitted by Lessor. * * * 6. Lessor reserves the right to use said airplane for his own purposes, at any and all times, when the same is not required in connection with Lessee's business. No separate charge was assessed Bullock's under the lease for its on-demand access to the plane, and there is no evidence that William made any attempts to rent the Bonanza to other parties. Lloyd, who was at that time licensed to operate a single-engine plane, flew the Bonanza when William needed to go on buying trips. William began to take flying lessons after he purchased the plane, but there is no evidence that he ever qualified himself to fly the Bonanza. At the time he purchased the Bonanza, William was informed by Vincent Gingras (Gingras), a salesman for Denver Beechcraft, that the plane might have an oil consumption problem, but that Beechcraft would stand behind the plane if such problem did in fact occur. Oil consumption problems did develop during the latter part of 1968, and due to such, Bullock's was without the use of the plane *58 from November 11, 1968 to January of 1969. There were also problems with the plane's radio. A return flight from Palm Springs, California, to Glenwood Springs in September of 1968 had to be significantly diverted from the ordinary route due to several landings required in order to obtain repairs for the radio. While William thus did have mechanical problems with the plane in 1968, some of which recurred in 1969, Bullock's was able to use the plane for a number of buying trips during that year. In fact, aside from a trip to Salt Lake City in early November, all of William's buying trips in 1968, from the time of the Bonanza's purchase, were made on it. A contemporaneous record of some of the flights made on the Bonanza, and the purposes of such flights, was kept by Lloyd in a diary. After the IRS began its audit, Lloyd transferred the information in the diary to the Bonanza's log book. From a review of the log record, together with a review of Bullock's records of buying trips and expenses incurred on such during 1968, it is apparent that Bullock's was only infrequently charged the $30 an hour rate for the plane specified in the lease agreement. The following table lists William's *59 business flights on the Bonanza in 1968. We have not included those flights taken to have the plane "checked out" for safety or for repairs, or any flights upon which mechanical troubles caused a substantial change in the normal flight route. Next to each trip - which consists of one or more flights - is the record, if any, of such trip on Bullock's buying trip expense account: Flight
Business Trip (from log)
Date
Duration
(1)
Denver to Salt Lake City
8/16
2 hr. 40 min.
Salt Lake City to Denver
8/18
2 hr. 10 min.
Denver to Glenwood Springs
8/18
1 hr. 5 min.
(2)
Glenwood Springs to Palm Springs
9/3
5 hr. 10 min.
(3)
Glenwood Springs to Palm Springs
10/4
5 hr. 50 min.
Palm Springs to Glenwood Springs
10/9
4 hr. 45 min.
(4)
Glenwood Springs to Denver
10/13
45 min.
Denver to Glenwood Springs
10/17
1 hr. 10 min.
(5)
Glenwood Springs to Denver
11/7
55 min.
Denver to Salt Lake City
11/8
2 hr. 45 min.
Salt Lake City to Denver
11/12
2 hr. 25 min.
Denver to Glenwood Springs
11/13
45 min.
Entry as expense
on corporate books
(1)
No entry on books
(2)
$21 paid for commercial flight from Palm Springs
to Los Angeles
(3) $ 285 paid William for lease of plane
(4)
$ 52 paid William for lease of plane
(5)
$ 136.53 paid for a commercial airline fare
On William's *60 Federal income tax return for 1968, income from airplane rentals was listed as $337, which is the amount reflected in the corporate books as paid for trips 3 and 4 on the above chart. Thus, Bullock's was charged no rent under the lease for trips 1, 2 and 5 - trips involving over 60 percent of the total flight time which we have deemed should have been covered by the lease agreement. [9] *61 Further, as to all of the trips, there is no evidence to suggest that Bullock's ever made the supposedly required payments for oil and gas expenses. Besides using the plane for buying trips, Lloyd flew the plane to enable him to attend and take part in training classes, and to have the plane repaired and inspected. Other members of William's family - including his wife and oldest son - flew in the Bonanza during 1968. While those members of his family who did fly in the plane were also employed by Bullock's, there is no indication that their presence on a given flight had any business purpose. Because Lloyd admitted that he may not have logged all flights on the Bonanza, and because the log was the only record of flights presented, we cannot find that there was no personal use of the plane during 1968. William continued to own the Bonanza until sometime in early 1970. For 1969, William's Federal income tax return reflects airplane rental receipts of $1,575. Expenses and depreciation for that year totaled $8,510, and with a 35-percent reduction for personal use, the claimed deduction in connection with the plane was $5,532. In either January or February of 1970, William traded in the Bonanza for a new multi-engine Beechcraft plane. The purchase price *62 of the new plane, including trade-in allowance, was $78,169, at least part of which was covered by a loan. The Bonanza E33 model was subsequently discontinued by Beechcraft. While a good trainer plane, the Bonanza had insufficient power for continued use over mountainous terrain when carrying four passengers and merchandise, as was occasionally 25 the case on William's buying trips when other members of his family would come along. [10] In his return for 1970, William included $2,691 as rental income from the new plane. Total expenses and depreciation were over $30,000, but for purposes of claiming a deduction, such figure was reduced by a 35-percent allocation to personal use. On his 1968 joint return, William claimed a deduction for depreciation and expenses of the airplane in the amount of $6,353. In addition, he claimed $1,616 as an investment credit on the plane. In his statutory notice of deficiency, respondent disallowed the expense and depreciation deductions to the extent they exceeded $337, the rental income from the plane during 1968, and *63 disallowed in full the claimed investment credit. In his petition to this Court, William alleged error on his part in failing to take a deduction for the full amount of expenses, including depreciation, incurred in connection with operation of the Bonanza in 1968. On his 1968 return William had reduced the total amount of expenses, including depreciation, incurred in connection with the Bonanza, by 26 20 percent, which on the return he had alleged was the percentage of personal use of the plane. [11] *64 In the petition, William alleged that there was no personal use of the plane and that he was entitled to a deduction for the full amount of depreciation and expenses - $7,941. William, on his 1968 return, had made the same 20-percent reduction in computing the allowable investment credit, and in his petition he alleged that such allocation was erroneous and that he was entitled to a full credit of $2,020. Accordingly, he has alleged an overpayment of taxes for 1968, and has claimed a refund. OPINION Issue 1. Advances to William
The first issue for our decision is whether respondent has properly characterized as taxable dividends certain advances made by Bullock's to William during 1966, 1967 and 1968, to the extent that such advances exceeded payments by William to Bullock's during those years. While respondent has urged that such advances were taxable dividends, it is William's position that such were merely loans from Bullock's to him, and that hence, they are not properly includable in his taxable income for those years. We agree with respondent and find that such advances were taxable dividends during the years in question. In determining whether advances by a corporation to its shareholder are loans or taxable dividends, the essential question is whether the parties, at the time the advances were made, had a real intention to create a debtor-creditor relationship. Such a relationship can be defined as one in which the borrower has the intention to repay the withdrawals made, and the lender, the intention to enforce its right to repayment against the borrower. Electric & Neon, Inc., 56 T.C. 1324, 1339 (1971); *65 Chism's Estate v. Commissioner, 322 F.2d 956, 960 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; Jack Haber, 52 T.C. 255, 266 (1969), affirmed per curiam 422 F.2d 198 (C.A. 5, 1970); Walter K. Dean, 57 T.C. 32, 43 (1971). Whether such a relationship exists between the corporation and its shareholder is a question of fact, to be determined on the basis of all the relevant evidence contained in the record. Chism's Estate v. Commissioner, 322 F.2d at 960. And where the corporation is controlled by the individual making the withdrawals, as is the situation in the instant case, we must subject such evidence to a close scrutiny, to insure that the formal actions of the parties reflect rather than disguise the true nature of the transaction. W. T. Wilson, 10 T.C. 251, 256 (1948), affd. 170 F.2d 423 (C.A. 9, 1948), certiorari denied 336 U.S. 909 (1949); Elliott J. Roschuni, 29 T.C. 1193, 1202 (1958), affirmed per curiam 271 F.2d 267 (C.A. 5, 1959), certiorari denied 362 U.S. 988 (1960). In the instant case, we are unable to find that William had an intent to repay the advances made him by Bullock's. Examining first his record of repayments, we find that William made only *66 one during the taxable years involved in the instant case. That payment of $6,000 in January of 1966 was made at a time when the outstanding withdrawals already totaled almost $30,000. Afterwards, for over three years, while the balance in his advance account almost doubled over the January 1966 total, no further repayments were made. Repayment activity reached significant levels only after the Internal Revenue Service indicated its interest in auditing Bullock's books and records. On March 31, 1969, two weeks before the audit was to begin, it was stated in the minutes of a board meeting that William's $10,000 bonus for fiscal 1969 had been credited on his advance account. There is nothing in the record before us to dispel the suspicion with which we view such alleged repayment - made at a time when the corporation and William were undoubtedly aware that an audit was scheduled and about to commence. We cannot give much weight to such a payment in determining the intent of the parties at the time of the actual withdrawals. Cf. George R. Tollefsen, 52 T.C. 671, 680 (1969), affd. 431 F.2d 511 (C.A. 2, 1970), certiorari denied 401 U.S. 908 (1971); Walter K. Dean, 57 T.C. at 45. Similar *67 weight must be given to all subsequent credits, all of which were made after the commencement of the IRS audit. And we give even less weight to those payments made after the issuance of respondent's statutory notice in August 1971. Bayou Verret Land Co. v. Commissioner, 450 F.2d 850 (C.A. 5, 1971), affirming a Memorandum Opinion of this Court; Ben R. Meyer, 45 B.T.A. 228, 240 (1941). Such include William's largest single payment of $21,294 in January 1972.
It has been alleged that it was William's intention to establish a regular plan of repayment by each year crediting his annual bonus to the advance account. There is no convincing evidence before us, however, to sustain such a contention. Indeed, the testimony of William and his accountant, McNulty, were in conflict on this point. While McNulty testified that William had told him to credit such bonuses on the account, and that he had in error neglected to do so, it was William's understanding that his bonuses were to be credited on the note to his father, a separate obligation. Furthermore, we found no indication or acknowledgment in the corporate records or minutes that any such plan of repayment existed. Instead, in each of *68 the years before us, Bullock's would simply allow William to substitute a new note in place of the one executed the previous year. The notes acknowledged no such bonus repayment plan, and were simply demand instruments, the 4-percent interest on which was never paid. In addition, in the financial statement which William allegedly used to obtain loans and discounting privileges from commercial banks, there was no entry beside "Bills, (Notes) Payable, other than the above," where one would expect that it would be appropriate to enter any "obligation" to Bullock's. There was an entry of approximately $114,000 as owed to "relatives and friends," but there is nothing in the record which would enable us to make a finding that such figure included the corporate advances. We find it entirely possible that, including the outstanding balance on the note to his father, he owed such a sum to relatives and friends. Thus, it has not been established that William considered the advance account enough of a real obligation to include it as a liability on his declaration of financial condition. Furthermore, on such financial statement there was no indication that the Bank of Glenwood stock there *69 listed as an asset was then currently being used as collateral to secure a note to Bullock's - some evidence that William felt his ownership of such to be unrestricted. We are also unable to find that Bullock's, as "lender," had the intent to require a repayment of the advances. While William did execute notes to Bullock's, the notes were demand instruments. Where, as here, the corporation is controlled by the shareholder making the withdrawals, we look with some doubt upon such an instrument, which leaves the decision to make payments of the principal entirely in the discretion of the very person who is obligated on the notes. In the instant case, in addition to the rather meager record of principal repayments in the period before the IRS audit, William made no interest payments in any amount. While such failure to pay interest gave Bullock's the right to demand immediate and full payment of the notes, such a demand was never made. Indeed, Bullock's never even bothered to accrue such interest on its books, and while Bullock's did request some collateral from William in the form of shares of stock in 1968 and 1969, there was no evidence that the value of such shares even approximated *70 the $40,000 - $60,000 outstanding in the advance account in those years. It is argued that Bullock's made no such demand for payment because it felt reasonably secure, in light of William's financial condition, that the notes would eventually be paid. Of course, the mere fact that William might have been financially capable of paying the notes at any time cannot control our decision as to loan or dividend characterization. Estate of Taschler v. United States, 440 F.2d 72, 76 (C.A. 3, 1971); W. T. Wilson, 10 T.C. at 253, 256. For, assuming William was financially capable of paying off the notes at any time, the question arises - unanswered in the instant case - why he didn't in fact go ahead and make the payments. George R. Tollefsen, 52 T.C. AT 680. Furthermore, William has not established that he was in fact, during the years before us, financially capable of paying off the balance in the advance account. The only evidence presented of financial standing is the entirely unverified financial statement, prepared by William and McNulty, which William used to secure bank loans and discounting privileges. The reliability of that statement's asset valuations is open to doubt in light *71 of William's inability at trial to present any evidence to uphold a $29,700 valuation which the statement placed on the Bank of Glenwood stock he pledged as collateral for the notes. When respondent challenged such valuation, arguing that the correct valuation was between $3,000 and $4,000, William was unable to substantiate the valuation posited in the statement. We do know that William was the 99.9-percent shareholder of Bullock's, and that in light of Bullock's constantly improving performance, its stock was probably valuable. However, we find it highly unlikely that William, with his great ambitions for the future of the store, would either sell or pledge this stock in any manner to provide funds for an "obligation" whose payment rested entirely in his own discretion. William cited a number of cases which, he argued, should control our decision on this issue. However, the facts in each of those cases are distinguishable from those before us here. Thus, because the issue of loan or dividend characterization is a factual one, depending on a weighing of the evidence before the Court, these and other cases, with varying factual patterns, cannot control the decision in the case *72 before us. As we did in those cases, we must here too freshly weigh the facts as they are before us. On the basis of the facts before us, we find that William has failed to carry his burden of establishing that there existed, as between himself and Bullock's, the requisite intent to create a debtor-creditor relationship. Thus, we uphold respondent's dividend characterization as to the advances in question. Issue 2. Deductions for Annual Bonuses: Section 267
The second issue for our decision is whether Bullock's is precluded by section 267 from taking deductions for the annual bonuses authorized for William for Services rendered during the 1967, 1968 and 1969 fiscal years. When certain specified conditions are present, section 267(a) (2) operates to deny to a taxpayer deductions for expenses otherwise allowable under sections 162 or 212 of the Code. [12] *74 35 The only condition, the existence of which is in dispute, is that specified in section 267(a) (2) (A): If within the period consisting of the taxable year of the taxpayer and 2-1/2 months after the close thereof (i) such expenses or interest are not paid, and (ii) the amount thereof is not includible in the gross income of the *73 person to whom the payment is to be made * * * Bullock's has conceded that no actual cash payments were made within the specified 2-1/2 month periods after the close of each of its fiscal years involved in the instant case. It has argued, however, that William did constructively receive each of such bonuses within the required 2-1/2 month periods, and that such receipt is sufficient to avoid the necessary condition specified in section 267(a) (2) (A) (ii). While Bullock's assertion as to the effect of a constructive receipt on the applicability of section 267 is correct, Geiger & Peters, Inc., 27 T.C. 911, 918-9 (1957); Young Door Co., Eastern Division, 40 T.C. 890, 894 (1963); F. D. Bisset & Son, Inc., 56 T.C. 453, 461 (1971), we find that it has not established such constructive receipt as to the $3,000 and $2,000 bonuses authorized, respectively, for its 1967 and 1968 fiscal years. However, we find that William did constructively receive the $10,000 bonus voted for Bullock's 1969 fiscal year within the requisite 2-1/2 month *75 period, and that hence, respondent has erred in disallowing Bullock's deduction for such bonus under section 267. Income is constructively received by a taxpayer "in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year, if notice of intention to withdraw had been given." Sec. 1.451-2(a), Income Tax Regs. Mere corporate authorization of salary or bonus for an employee, even if such employee has effective control over the corporation due to stock ownership, has been held not to constitute the requisite constructive receipt. Hyland v. Commissioner, 175 F.2d 422, 423-4 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court. What the doctrine seems to require is that the individual have access to such salary or bonus without the need for any further corporate action of any kind. Fetzer Refrigerator Co. v. United States, 437 F.2d 577 (C.A. 6, 1971); F. D. Bisset & Son, Inc., supra at 462-3. Thus, a president and controlling shareholder may be considered to have "received" a bonus when he is not only authorized to receive such *76 by a corporate resolution, but has also the authority to write checks for such amounts on the corporate treasury. Fetzer Refrigerator Co., supra at 580; W. C. Leonard & Co. v. United States, 324 F. Supp. 422, 424-5, 428 (N.D. Miss., 1971); Rev. Rul. 72-317, 1972-1 C.B. 128-9. Corporate book entries of such salary or bonus are also strong evidence supporting a constructive receipt. F. D. Bisset & Son, Inc., supra at 463; Hyplains Dressed Beef, Inc., 56 T.C. 119, 127-8 (1971). As to the bonuses of $3,000 for fiscal 1967, and $2,000 for fiscal 1968, neither of which were included by William in his individual returns, the only evidence presented on the issue of constructive receipt is the corporate resolution passed after each of those years authorizing the respective bonus. Unlike the situation in Hyplains Dressed Beef, supra at 121-3, 127-8, a case upon which Bullock's has relied, it has not been here established that book entries of any kind were made within the statutory period, and there is nothing in the record which would allow us to find that William had the authority, given the corporate resolution, to write checks to himself on the corporate treasury. In the absence of such *77 further evidence, the bare corporate resolutions, even in light of William's overwhelming stock ownership, are insufficient to allow us to make a finding of constructive receipt as to the 1967 and 1968 bonuses. Hyland v. Commissioner, supra at 424; Lacy Contracting Co., 56 T.C. 464, 469-70 (1971). Revenue Ruling 72-317, 1972-1 C.B. 128, does not help Bullock's. For while in that ruling respondent indicated that he would invoke constructive receipt in the absence of book entries reflecting the corporate resolutions passed, he also indicated that proof of the individual's access to the corporate checkbook would be required. Rev. Rul. 72-317, 1972-1 C.B. 128-9.Indeed, in the Fetzer and Leonard cases, which respondent cited approvingly in the ruling, not only could the corporate executives write checks on the corporate accounts, but in addition, book entries were, in face, made. Fetzer Refrigerator Co., 437 F.2d at 577-8, 580; W. C. Leonard & Co., 324 F. Supp. at 424-5, 428. No such evidence has been presented in the instant case, and hence, we find that respondent correctly disallowed, under section 267(a) (2), deductions for the 1967 and 1968 fiscal year bonuses. The bonus for the *78 1969 fiscal year, which William included in his 1969 calendar year return, stands on a different footing. On March 31, 1969, a date within the 2-1/2 month period specified in section 267(a) (2) (A), the corporation in its minutes clearly indicated that such bonus of $10,000 was to be used as a payment on the note then outstanding. To demonstrate this recognition of William's intention as to the use of the bonus, the amount of the new note William executed that day reflected that a $10,000 payment had been made. [13] *79 The fact that we have looked askance on these corporate minutes in deciding the dividends versus loan issue above, due to their proximity to the IRS audit, does not affect their importance as to the section 267 issue now being considered. For here, the issue is whether William constructively received such $10,000 bonus - by demonstrating an ability to command its utilization - and not whether such use demonstrates that in 1969 and in prior years, William felt himself under a debtor's obligation to make such credit. It is true that a book entry reflecting such use of the bonus was not made within the 2-1/2 month period specified in section 267(a) (2) (A). However, it has never been held, and respondent's Revenue Ruling 72-317 would reject such a holding, that book entries are a prerequisite to a demonstration of constructive receipt. Weil v. Commissioner, 173 F.2d 805, 807-8 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court, certiorari denied 338 U.S. 821 (1949); James J. Cooney, 18 T.C. 883, 886-7 (1952); Rev. Rul. 72-317, 1972-1 C.B. 128; cf. Acer Realty Co. v. Commissioner, 132 F.2d 512, 516 (C.A. 8, 1942), affirming 45 B.T.A. 333 (1941). *80 Here we have evidence that once a corporate resolution was passed, if William wished to have the bonuses credited toward his advance account with Bullock's, that such could be done without any further corporate action, by merely informing his accountant to make such an entry. Further, there is no reason to suspect that William could not have made these very entries himself as soon after the resolutions as he wished. Had we found that the notes constituted a real indebtedness, we would have had little trouble determining a constructive receipt in William's affirmative election to have the bonus used as an offset to his indebtedness. Our holding on the dividends versus loans issue, [14] however, does not deter us from still finding a constructive receipt on the facts before us. One of the effects of that finding was to characterize any credits on the advances account as contributions to capital, rather than as repayments of indebtedness. Thus, William's directive to the corporation evidenced by the March 31 minutes, must be seen as an affirmative election to contribute back the bonus to corporate capital, the effect of which was to increase his basis in his stock. A contribution to *81 capital is, of course, one way to direct the beneficial use of earnings to which one is entitled. And a contribution to capital, in the instant case, is a use of the bonus which William could carry through on his own, without the need for further corporate action. In light of William's actions, and in light of his ability to carry out his expressed intentions as to the 1969 bonus without the need for any further corporate action we would find it to be a far too wooden reading of the doctrine of constructive receipt to deny its application here. Hence, we hold, on this section 267 attack, that respondent erred in denying Bullock's a deduction for such fiscal 1969 bonus. Issue 3.Unreasonable Compensation Having held that respondent may not disallow Bullock's claimed deduction for the $10,000 fiscal 1969 bonus under section 267, we consider his alternative ground for disallowance, that the bonus represents excessive and unreasonable compensation to William.
Section 162(a) (1) allows as *82 a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered." The question of reasonableness of a given salary or bonus is essentially a question of fact, to be determined on the basis of the record before the Court. Huckins Tool & Die, Inc. v. Commissioner, 289 F.2d 549, 552 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court; Ben Perlmutter, 44 T.C. 382, 401 (1965), affd. 373 F.2d 45 (C.A. 10, 1967). We find that William's $10,000 bonus for fiscal 1969 was not an unreasonable compensation. Hence, Bullock's is entitled to a deduction for such bonus. In his disallowance of the $10,000 bonus deduction, respondent relied chiefly on the fact that whereas between 1968 and 1969, Bullock's claimed deduction for William's salary increased from $38,000 to $50,200 (an increase of approximately 32 percent) over the same period, Bullock's gross receipts increased by only 8 percent. Respondent, however, has ignored other rather useful indicators of Bullock's performance. Gross profits over the same period increased by over 22 percent, net income before salary and income taxes, by more than 28 percent. Furthermore, in 1967, Bullock's *83 claimed a $47,000 deduction for William's salary and bonus, a deduction which respondent has not challenged. While such failure to challenge does not bind respondent to an approval of such deduction, it is a factor to be taken into account in evaluating the reasonableness of William's salary in terms of what he has earned in previous years. Ridgewood Provisions, Inc., 6 T.C. 87, 90 (1946); Coe Laboratories, Inc., 34 T.C. 549, 585 (1960). If we, instead, compare figures over these two years - 1967 and 1969 - we find that while the claimed deduction for William's salary and bonus increased by less than 7 percent, Bullock's gross receipts increased by over 13 percent, gross profits by over 36 percent, and net income before salaries and income taxes by over 38 percent. And it is not to be doubted that William was a major contributor to the rising figures cited above. William was involved in every aspect of the corporate business. Besides his general duties as chief corporate executive, it was William who would, among other functions, train new employees, plan any new expansion, make all buying decisions, and go on all buying trips. While it is true that during the years before us, *84 Lloyd became head buyer for the basement department, his activities were extensively supervised by William, and all final decisions on purchases were still William's. To all such functions, William brought over 20 years of experience in the business - experience whose worth to Bullock's was undeniably substantial. Major credit for Bullock's consistently improving performance cannot be denied to William. [15] *85 It is true that Bullock's did not present any evidence on what other persons were making in similar positions in similar businesses. But it did produce an excellently qualified witness, Robert Hyndman (Hyndman), president and general manager of Mountain States Placement Services in Denver. Hyndman, a certified placement consultant and graduate of the University of Colorado with a degree in personnel administration, had been in the field of executive and professional placement in the western states for 10 years. It was Hyndman's opinion, based on his experience in the area, that a $46,000 salary would not have been unreasonable for William based on Bullock's fiscal 1968 figures, a good indication, we find, that he would think the claimed deduction of $50,200 reasonable in light of Bullock's substantially improved performance in 1969. Hyndman emphasized that he rendered his opinion on the basis of the types of extra duties which William undertook. He also pointed out the difficulty *86 of attracting good people to a job such as William's, due to its undesirable location and the long and irregular workdays demanded. While we are not bound by opinion evidence on the issue before us, Golden Construction Co. v. Commissioner, 228 F.2d 637, 639 (C.A. 10, 1955), affirming a Memorandum Opinion of this Court, we found Hyndman to be an excellent and highly qualified witness, whose opinion on reasonableness certainly deserves weight together with the other factors we have considered. Respondent has presented no such expert witness and did not in any way challenge Hyndman's qualifications and experience. He indeed expended considerable effort in his reply brief attempting to interpret Hyndman's testimony as supporting disallowance, an interpretation we are unable to accept.[16] *87 The issue of reasonableness is not one susceptible to a precise formula treatment. Ben Perlmutter, 44 T.C. at 401. In each case, the best a court can do is to look at the evidence as presented by the parties, and use its best judgment in deciding whether in light of all circumstances the particular level of compensation exceeds what is reasonable. We hold that Bullock's has sustained its burden of showing that the $10,000 bonus to William for fiscal 1969 was reasonable compensation, and thus deductible under section 162(a) (1). Issue 4. Airplane Deductions and Credit The final issue for our decision is whether William may claim depreciation and expense deductions, and an investment credit in connection with the airplane he owned in 1968. In their briefs, the parties have correctly pointed out that the resolution of whether William is entitled to either the deductions or the credit depends upon whether or *88 not William has established that he was in the trade or business of renting an airplane to Bullock's, or whether he held the plane to produce income through rentals to Bullock's. [17] *89 Before an individual can be considered to be in a trade or business, or to hold property for the production of income, it must first be established that his primary motive in engaging in the particular activity under examination is to make a profit on such activity. Hirsch v. Commissioner, 315 F.2d 731, 736 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; Margit Sigray Bessenyey, 45 T.C. 261, 273 (1965), affd. 379 F.2d 252 (C.A. 2, 1967), certiorari denied 389 U.S. 931 (1967); Jean U. Koree, 40 T.C. 961, 964, 966 (1963). The expectation of profit need not be a reasonable one, but it must at least be shown that the taxpayer in good faith intends that his enterprise shall yield a profit. Lamont v. Commissioner, 339 F.2d 377, 380 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; Margit Sigray Bessenyey, supra at 274. This question of intent is one of fact, to be determined on the basis of the record before the Court. Margit Sigray Bessenyey, supra at 274. In the instant case, we find that William in purchasing and leasing his plane to Bullock's, did not have the *90 requisite intent to make a profit from such rental, and hence that William is entitled neither to the deductions, nor to the credit that he is claiming. William purchased the Bonanza to fill an ascertained need of Bullock's for a quick and convenient means of transportation. It was William's testimony at trial that he, rather than Bullock's, made the actual purchase only because he did not want Bullock's balance sheets burdened by a further liability, and because he did not want the corporation to have to bear the losses which would result if the plane proved of little use to it. At the time of the purchase, no serious consideration was given to whether or not the airplane rental might yield a profit to William. William's only testimony in this connection was that, as Bullock's expanded, he could foresee an increased use of the Bonanza. There is nothing in the record, however, to indicate that William gave any thought to whether, even given the optimistic predictions of corporate expansion, the use of the plane could ever be frequent enough to allow him a profit on its rental. As further evidence of William's lack of a profit motive, we have found that William only infrequently *91 enforced his rights under the lease arrangement with Bullock's. In 1968, while the lease provided that Bullock's was to pay William $30 an hour, plus gas and oil expense, for use of the Bonanza, William in actuality allowed Bullock's a free rental of the plane for over 60 percent of the flying time allocable to Bullock's buying trips. Nor were gas and oil expenses paid by Bullock's for any of its trips that year. Such gratuity, we think, raises serious doubts as to William's repeated assertion that he was conducting his leasing arrangement with Bullock's on a thoroughly business-like basis. Cf. Richard L. Westerman, 55 T.C. 478, 482 (1970). It is true that William's income from airplane rentals to Bullock's increased steadily: $337 in 1968, $1,525 in 1969, and $2,691 in 1970. At the same time, however, expenses in connection with the plane also increased, with income lagging far behind and there is no evidence upon which we could base a finding that the income could ever reasonably have been expected to increase to the point where there would be a profit, much less to the point where the prior losses would be recouped. [18] Cf. Margit Sigray Bessenyey, 45 T.C. at 274. Furthermore, *92 the pattern of increase in rental income is a rather dubious indicator, in the instant case, of any latent potential for increased use of the plane in future years.For, as discussed above, there was considerable free use of the plane in 1968. [19] *93 Thus, the increase in the income might reflect no more than a full rental being charged Bullock's in 1969, in 1970, or in both years. While such can only be speculation, it is at least apparent that the income figures cannot be relied upon as demonstrating a real potential for substantially increased revenues from the lease arrangement with Bullock's. Thus, being unable to make a finding that there was a potential for profit in leasing the plane to Bullock's, the instant case is distinguishable from a case upon which petitioner relies, where such a potential was found to exist. Theodore Sabelis, 37 T.C. 1058 (1962). From all the factors discussed *94 above, we cannot find William to have sustained his burden of proving that he had a profit motive in renting the airplane to Bullock's. Rather, these factors, together with other testimony of William, suggest, as mentioned above, that William's dominant motive by far in purchasing and renting the Bonanza was to secure for his 99.9-percent corporation a needed means of transportation. William had great ambitions for Bullock's. Having worked with the corporation and its predecessor partnership for over 20 years, he believed enthusiastically that the time had come for expansion of the business into other areas of Colorado. An airplane might greatly facilitate such expansion, as well as allow Bullock's the convenient access it did not then have to air transportation for buying trips. It was these motives, motives focusing upon the success of the corporate business, which caused William to become interested in purchasing an airplane. Undoubtedly, he would have welcomed 53 a profit on the rental scheme, but it would have been a wholly unexpected profit, and one about which William was obviously little concerned in purchasing and renting the plane.
The expenses, including depreciation, *95 incurred in connection with the Bonanza were more properly those of Bullock's, rather than of William, and are, thus, not allowable as deductions to him. Deputy v. duPont, 308 U.S. 488 (1940); Bert B. Rand, 35 T.C. 956, 960 (1961); Harry Kahn, 26 T.C. 273, 274-275 (1956); Jacob M. Kaplan, 21 T.C. 134, 146 (1953). Plainly, we think William's handling of the Bonanza is best characterized as a nondeductible capital contribution to his 99.9-percent corporation. Jean U. Koree, 40 T.C. at 965-6. In summary fashion, William argued, in the alternative, that he was in the trade or business of being Bullock's chief executive officer. Assuming such to be true, we cannot find the plane to have been property "used" in that trade or business as required by the relevant statutory provisions. For William rented the plane to Bullock's for buying trips, an acknowledgment, we think, that the plane was being used in Bullock's, rather than William's trade or business. 54 As to those trips for which William charged Bullock's no rental, there is nothing in the record to suggest that such represented anything more than a capital contribution by William to his 99.9-percent corporation. Our holding that *96 William is not entitled to further deductions or to an investment credit on the Bonanza makes it unnecessary to consider the contention that he is entitled to a refund of taxes paid because he did not claim the entire deduction and credit to which he is entitled in connection with the plane. Decision will be entered under Rule 50 in docket No. 7463-71. Decision will be entered for the respondent in docket No. 7464-71. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. At trial, Bullock's conceded liability for this $22 addition to tax.↩
3. See However, fn. 8, infra ↩
4. The following is a list of the notes, each canceling the prior note, which were executed and delivered by William to Bullock's in connection with the advances: Date
Face Amount
March 1, 1965
$ 29,763.73
January 31, 1967
40,603.73
January 31, 1968
44,296.44
March 31, 1969
42,000.00
Each of such notes was a demand instrument, with 4-percent per annum interest payable semiannually. 5. This $15,000 credit entry was not made until several months after April 15, 1969. The July 1st date on the schedule is only an approximation. ↩
6. McNulty prepared the corporate and individual returns challenged by respondent in the instant case. ↩
7. Bullock's next highest paid employee was Lloyd, who was paid approximately $5,500 during fiscal 1967, $8,100 during fiscal 1968, and approximately $9,600 during fiscal 1969. ↩
8. It was stipulated that William purchased the slightly larger E33-A model plane. All the testimony at trial, however, indicated that William in fact purchased an E33, and that it was because of an inadvertent error of the parties that the stipulation indicated otherwise. Accordingly, we have decided to set aside such stipulated fact under Rule 31(b) (6), Tax Court Rules of Practice↩, and have found that William purchased an E33. This finding, however, does not affect our decision in the instant case. 9. It might be argued that the flight duration noted on Lloyd's logs was not exactly equivalent to the "flight time" for which Bullock's was to pay William. However, William's testimony on flight times to Denver and Salt Lake City accord closely with the figures in the log. As to flights to Palm Springs, it was testified to by William that the Bonanza had only a 3-1/2 to 4-hour gasoline supply, and so some of the time reflected in the logs may represent time spent on the ground refueling. It was William's estimate, however, that flight time to Los Angeles was 4 hours. Even making such downward adjustment as to flights between Glenwood Springs and Palm Springs, there is no significant change in our estimate of gratuitous use. 10. It was not established in the record that William was not aware of the power deficiencies of the Bonanza at the time of purchase. ↩
11. The following is a summary of rental income, expenses and depreciation in connection with the airplanes William has owned: Percent of
Claimed Rental
Exp. and
personal use
deduction on
Year
Income
Dep.
alleged on ret.
return
1968
$ 337
$ 7,941
20%
$ 6,353
1969
1,575
8,510
35%
5,532
1970 As noted above, William purchased a new plane early in 1970. *↩
2,691
30,349
35%
19,726
12. SEC. 267. LOSSES, EXPENSES AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS. (a) Deductions Disallowed. - No deduction shall be allowed - * * * (2) Unpaid expenses and interest. - In respect of expenses, otherwise deductible under section 162 or 212, or of interest, otherwise deductible under section 163, - (A) If within the period consisting of the taxable year of the taxpayer and 2-1/2 months after the close thereof (i) such expenses or interest are not paid, and (ii) the amount thereof is not includible in the gross income of the person to whom the payment is to be made; and (B) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (C) If, at the close of the taxable year of the taxpayer or at any time within 2-1/2 months thereafter, both the taxpayer and the person to whom the payment is to be made are persons specified within any one of the paragraphs of subsection (b). (b) Relationships. - The persons referred to in subsection (a) are: * * * (2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual; ↩
13. On the schedule above, at page 9, the $10,000 here under discussion was listed as having been entered on the corporate books sometime after July 1, 1969. However, as will be indicated below, the fact that it was not actually credited until such later date does not affect our conclusion as to its constructive receipt by William. At fn. 4, supra, we listed the notes executed by William. The note executed on March 31, 1969, reflects a $15,000 repayment (such repayment including all the bonuses of the three fiscal years before us) on the prior note. As mentioned above, however, the schedule, which concentrated solely on the dates of actual book entries, listed such credit as having been made after July 1, 1969. ↩
14. Although our finding on the dividends and loans issue was as to 1966, 1967, and 1968 calendar years, its relevance for William's 1969 calendar year and Bullock's 1969 fiscal year is unmistakable. ↩
15. Respondent has urged us not to consider any activities which William may have undertaken in 1968 for the Aspen store, as that was a separately incorporated entity whose proper expenses are not deductible by petitioner Bullock's. Respondent does not argue, however, that William's efforts in the way of expansion studies are not properly expenses of the Glenwood Springs' operation. Clearly, the spreading of the Bullock's name into different parts of Colorado was advantageous to the Glenwood Springs' store, despite the fact that those other "Bullock's" were separately incorporated. As far as activities, such as buying, carried on by William for the Aspen store, that store was not in operation until at earliest, late 1968. There is no evidence that William carried any merchandise to the Aspen operation at any time in 1968. And respondent has made no contention that William's efforts for the Glenwood Springs' operation were in anyway decreased from their level in prior years. 16. Hyndman testified that he would advise an individual considering a job similar to William's to request a $40,000 salary. However, we find inapposite a comparison between what a reasonable salary would be for an individual just commencing work at a particular position, and what such would be for a person already in that position for a number of years, as is true in William's case. Such a comparison ignores both the valuable experience one accumulates while at a particular position, as well as the fact that the person already at a particular position for a number of years has a record of prior performance at such position upon which to base his requests for compensation. 17. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income * * * SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. SEC. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property. - [eligible for investment credit] * * * Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable * * * 18. Expenses, including depreciation, claimed by William during those years, were as follows: Year
Expenses, including depr.
Claimed on return It is to be noted that William has now alleged that his adjustment for 1968 was unnecessary because there was no personal use of the plane. We do not know if William is making a similar contention for his adjustments in 1969 and 1970, years not before us in the instant case. We do not think that the 1970 rental income total has much relevance to the issue of William's profit motive in 1968. For the plane producing such income was not the Bonanza, but a far more expensive and powerful craft. One of the Bonanza's major problems had been its lack of sufficient power to carry the merchandise William purchased on buying trips. This is a problem which William has failed to establish he was unaware of the time he purchased the plane. The only testimony directly in point is that of Gingras, one of William's witnesses, and a salesman for DenverBeechcraft who said that William was indeed aware of of the power problem at the time of the Bonanza's purchase. Thus, it may be that some part of the rental income from the new plane in 1970 was due to trips which William in 1968 would not have expected the Bonanza to be capable of making. *↩
1968
$ 7,941
$6,353
1969
8,510
5,532
1970
30,349
19,726
19. Such free use also seriously erodes William's argument that it was mechanical difficulties which kept the Bonanza from rendering a better rental performance in 1968.